# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

\* \* \*

REGINALD HOWARD,

    Plaintiff,

v.

S. FOSTER, *et al.*,

    Defendants.

Case No. 2:13-cv-01368-RFB-NJK

**ORDER**

**Findings of Fact and Conclusions of Law After Court Trial**

## I. INTRODUCTION

This civil rights action involves several incidents between the Plaintiff, Reginald Howard ("Plaintiff" or "Howard") and certain Corrections Officer ("COs") at the Southern Desert Correctional Center ("SDCC"), an institution within the Nevada Department of Corrections ("NDOC"). Plaintiff's surviving claims for trial involve an incident that occurred on February 10, 2012 ("the February 10, 2012 Incident"); an incident that occurred on November 10, 2011 ("the November 10, 2011 Incident); and an incident that occurred on August 19, 2012 ("the August 19, 2012 Incident").

## II. PROCEDURAL HISTORY

Plaintiff filed a *pro se* Complaint on October 22, 2013, alleging several causes of action against the Deputy Director of the NDOC, S. Foster, and eleven correctional officers employed by SDCC in their official and individual capacities. (ECF No. 4). Howard initially brought six claims under the First, Eighth, and Fourteenth Amendments, each arising from separate sets of facts. After Motions to Dismiss and Motions for Summary Judgment were filed and heard, the following claims remained for trial: Count I, First Amendment retaliation and Eighth Amendment excessive

force against Defendant Gustavo Sanchez ("Sanchez"); Count V, First Amendment retaliation against Defendant Sean Bloomfield ("Bloomfield"); and Count VI, First Amendment free exercise claim against Defendant Aaron Dicus ("Dicus"). The Court held a bench trial on these claims on November 14, 2017, November 15, 2017, November 16, 2017, January 8, 2018, and June 6, 2018, and took the matter under submission.

### III. JURISDICTION AND VENUE

This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 for claims arising under the First Amendment and Eighth Amendment of the United States Constitution. Venue is proper because the underlying actions and corresponding damages occurred within Clark County, Nevada.

### IV. FINDINGS OF FACT

Federal Rule of Civil Procedure 52(a)(1) requires the Court to "find the facts specially and state its conclusions of law separately" in a bench trial. Fed. R. Civ. P. 52(a)(1). Factual findings must be sufficient to indicate the basis for the Court's ultimate conclusion. Unt v. Aerospace Corp., 765 F.2d 1440, 1444-45 (9th Cir. 1985) (citing Kelley v. Everglades Drainage Dist., 319 U.S. 415, 422 (1943)). The findings must be "explicit enough to give the appellate court a clear understanding of the basis of the trial court's decision, and to enable it to determine the ground on which the trial court reached its decision." United States v. Alpine Land & Reservoir Co., 697 F.2d 851, 856 (9th Cir. 1983), cert. denied, 464 U.S. 863 (1983) (citations and quotation marks omitted).

After receiving evidence at the bench trial, the Court makes the following findings of fact:

- **The Parties**
    o At all times relevant to the claims in this case, Howard was in the custody of the Nevada Department of Corrections ("NDOC") and housed at Southern Desert Correctional Center ("SDCC"). Howard has been a practicing Muslim since 1985.
    o At the time of the alleged events on February 10, 2012 Defendant Sanchez was a Correctional Officer ("CO") assigned to the Search and Escort team. As a Search

and Escort officer, Sanchez was required to retrieve emergency grievances from inmates and take them to the shift supervisor.

- o At the time of the events alleged on November 12, 2011, Defendant Bloomfield was a Senior CO assigned to SDCC.
- o At the time of the events alleged on August 12, 2012, Defendant Dicus was a CO assigned to the gym. He was in the Regular Days Off ("RDO") officer role, which meant that he filled in for COs that were taking the day off. Prior to working for the NDOC, Dicus previously served in the military for seven years of active duty and was deployed with the National Guard thereafter for a year.

- **Factual Findings Related to the February 10, 2012 Incident**
    - o On or around February 10, 2012, Howard was housed in Unit 1 at SDCC. That afternoon, Howard was in the SDCC chapel taking part in Jumu'ah prayer services.
    - o At approximately 3:00 p.m., after prayer services were over, Howard returned to his cell. When he returned to his cell, Howard discovered that his property and legal paperwork had been searched and left scattered throughout the cell. Howard also discovered that some legal paperwork which he had been storing in an envelope was removed from the envelope and placed on his bed. The legal paperwork which had been removed from the envelope and placed on Howard's bed was an affidavit Howard had written regarding an incident involving another inmate and Defendant Sanchez.
    - o Howard immediately went to the Unit 1 "bubble"—the unit control room —to ask former CO Eric Stein ("Stein"), not a party to this action, for an emergency grievance.
    - o Howard made this request during "count" which is done five to six times daily, to ensure all inmates are present. It is unusual for an inmate to request an emergency grievance during count, and doing so presents safety concerns for the COs on duty as they are tasked with both ensuring all inmates are present in the unit, as well as immediately retrieving the emergency grievance from the inmate.

- Correctional Officers at SDCC are required to address an emergency grievance right away, and it is not discretionary.
- Stein did not provide Mr. Howard with an emergency grievance form, so Howard went down the tier of Unit 1 to ask other inmates if they had an emergency grievance form but found that none of them had one.
- Howard then returned to his cell, found an informal grievance form, and sat down on the toilet in his cell to fill it out.
- The toilet in Howard's cell was located adjacent to the rear of the cell. The cell measured approximately eight feet across by ten feet long.
- While Howard was filing out the informal grievance, Stein contacted Sanchez to request that he retrieve Howard's grievance. Sanchez and former CO Francisco Acala ("Acala"), a temporary duty officer assisting Search and Escort, headed to Unit 1 to retrieve Howard's grievance. Acala is not a party to this action.
- It is customary for NDOC employees to retrieve grievances in pairs based upon safety concerns, such as an ambush or fight between inmates.
- At the time Stein radioed for Sanchez to retrieve Howard's grievance, Sanchez was not aware of the substance of Howard's grievance when ordered to the cell and was unaware if there was a dangerous situation.
- When Sanchez and Acala arrived to the unit, they approached Howard's cell along with Stein. When they opened the door to Howard's cell, Howard was still sitting on his cell toilet, filling out the informal grievance form he had found; Howard's cellmate was also present. The officers ordered Howard's cellmate to leave the cell.
- CO Stein and CO Acala stood at the door of Howard's cell, while Sanchez entered. Sanchez entered the cell for the purpose of retrieving the grievance. Sanchez told Howard to give him the grievance, saying "Lawyer Guy, Lawyer Guy, give me the grievance."
- Howard was not done filling out the informal grievance form and turned his body away from Sanchez so Sanchez could not read what he was writing.

- Howard told Sanchez, "Yeah, I know you all been in here reading my legal mail" and "you going down on civil rights violations." As he said this, Howard had a prison-issued ink pen in one hand, and the grievance form in the other hand.
- Sanchez told Howard that his statement "could be perceived as a threat" and ordered him to stand up and put his hands on the wall, then directed him to place his hands behind his back. Howard stood up quickly, but complied with Sanchez's commands.
- Sanchez restrained Howard by his shoulder and his right wrist to prevent further movement and resistance.
- Howard did not complain of discomfort. Sanchez did not tighten the restraints or bend Howard's fingers during the process of restraining Howard.
- Sanchez then escorted Howard out of the cell. Sanchez entered the bubble, and Howard told two other corrections officers who were outside the bubble that he was injured and needed medical care.
- The officers took Howard to the infirmary, where he was seen by a nurse who gave him an ice pack, ibuprofen, and he was told to see the doctor when he came in.
- Sanchez retrieved a camera and took pictures of Howards chest, back, hands, wrists, top of head, arms, legs, and feet within 30 minutes of the grievance retrieval. These photographs do not show any markings around Howard's wrist or any new bruising or marks.
- Plaintiff's medical records do not reflect any determination of injury as a result of the Incident.
- Following the Incident, Sanchez issued a notice of charges to Howard charging him with threats. Howard had a disciplinary hearing on the charges, was found guilty, and received 120 days of disciplinary segregation.
- NDOC Administrative Regulation ("AR") 405 governs the standard procedures for use of force by corrections officers. Pursuant to AR 405.02(1)(A), '[w]hen force is necessary, it will be limited to the minimum degree necessary to resolve the

situation." Further, AR 405.02(1)(B) and 405.02(2) advise that prior to any use of force, a corrections officer should use verbal commands or a "show of force."
- o Sanchez used the minimum degree of force necessary to restrain Howard on February 12, 2012. Howard quickly stood up, still holding the pen he was writing with, after telling Sanchez that he was "going down." The sequence of physical actions could objectively have been perceived as threatening. The two were in very close proximity in a small cell, during count. Sanchez informed Howard that his actions were threatening before restraining Howard.
- **Factual Findings Related to the November 12, 2011 Incident**
  - o On November 12, 2011, Howard went to the SDCC prison property room to obtain a hot pot to replace one that had been lost by SDCC officials. Nonparty CO Klein ("Klein"), who was working in the property room, provided Howard with a replacement hot pot. Howard immediately noticed that the hot pot had been altered because the cord was too long, and it was missing a sensor that automatically shuts off the hot pot when water reaches a boiling point.
  - o That day, Bloomfield and his unit were ordered to conduct random cell searches. The officers were ordered to conduct a wing sweep, which is an attempt to search every cell in a unit in one day so that contraband may not be moved from cell to cell.
  - o SDCC COs confiscate altered items for a number of reasons. A hot pot altered to remove the sensor that shuts the device off when the water boils can create a fire hazard. Additionally, when an item has been altered to change the name of the owner, it may be confiscated to prevent trading and bartering among inmates.
  - o At approximately 7:00 p.m. that evening, Howard was in his cell when Bloomfield, Sanchez, and two other nonparty COs walked over to his cell to conduct a search. Bloomfield and the other officers ordered Howard to leave his cell and had him stand outside the cell with his hands on the wall while they conducted their search.
  - o Nonparty Damien Bradley ("Bradley"), a former SDCC inmate who was housed in

a cell directly across from Howard's in November 2011 observed the COs throwing Howard's legal paperwork on the floor during the search.

- During the search, Bloomfield seized the hot pot Howard had obtained from the property room earlier in the day. Bloomfield explained to Howard that he was seizing the hot pot because it was altered.
- Howard responded "Well, man, you can call up Officer Klein. That's the one that Officer Klein just gave to me . . . a few hours ago." Bloomfield also confiscated a fan from Howard.
- Howard then asked Bloomfield for an emergency grievance form to grieve Bloomfield's seizure of the hot pot and other issues he had with the officers' search of his cell. Bloomfield responded that he would give Howard a grievance after the officers were done with their search. The officers continued conducting their cell searches and made Howard wait approximately 20 minutes with his hands on the wall.
- When the officers had completed their search, they put Howard back in his cell. About ten minutes later, CO Lewis and CO Christianson, not parties to this action, came back to Howard's cell. The officers ordered Howard out of his cell, told him to hold the wall, and gave him ten emergency grievance forms.
- Once Howard was able to return to his cell, he was able to fill out and submit an emergency grievance form. In the emergency grievance, Howard alleged that the officers searched his cell and forced him to hold the wall for an extended period of time in retaliation for a prisoner civil rights suit he had recently filed in federal court which listed Bloomfield as a defendant. After his emergency grievance was rejected, Howard submitted an informal grievance.
- Bloomfield later wrote a notice of charges for Howard's possession of the property and turned it into his sergeant. At SDCC, the shift supervisor determines what disciplinary charges are brought against the inmate based upon the CO's report in the notice of charges.

- o Bloomfield's sergeant charged Howard with "Organizing a Work Stoppage/Demonstration" and "Giving False Information" and Howard was found guilty. As a result, Howard lost prison store privileges and gym time for a week.
- o At the time Bloomfield searched Howard's cell and wrote the notice of charges, Bloomfield was unaware that Howard had filed a lawsuit, Case No. 2:11-cv-1402-KJK-GWF, against Bloomfield and other employees.
- o In that matter, although Howard filed his original Complaint on October 7, 2011, Howard then filed an Amended Complaint on November 1, 2011.
- o The Screening Order on the Amended Complaint was not filed until November 16, 2011, which was four days after the cell search.
- o The Office of the Attorney General did not make a limited appearance until December 7, 2011. The inmate mediation conference occurred on March 23, 2012.

- **Factual Findings Related to the August 19, 2012 Incident**
    - o August 19, 2012 marked the end of Ramadan, a month in which observant Muslims abstain from eating or drinking during daylight hours. The end of Ramadan is marked by the holiday of Eid al-Fitr ("Eid"), a three-day celebration. This is an important religious holiday for Muslims.
    - o On the morning of August 19, 2012, somewhere between 40 and 60 Muslim inmates were holding Eid prayer services in the SDCC gymnasium, including Howard. Religious services at SDCC are typically held in the Chapel, but due to construction, services were held at the gym on that day.
    - o The participants in the Eid prayer services intended to have a meal after Eid prayer was completed as part of their traditional religious practice. Three COs were in the gymnasium to monitor the prayer service: Dicus, nonparty CO Diggle, and nonparty CO Jones. The Muslim inmates were congregated on the floor of the gymnasium, and the officers were stationed about 20 feet away on a second-floor area near the SDCC barbershop and staff latrines.
    - o The Muslim inmates participating in Eid prayer services were arranged in two rows

of 30 each on prayer rugs facing the Muslim inmate imam who was leading the prayer. There was also one inmate standing on a "prayer post." The person on the prayer post was there to monitor the prayer and make sure the congregants were not interrupted. The room was quiet enough for the individual leading the prayer to be heard by the other prayer participants

- During the prayer service, however, Dicus began talking loudly enough for Howard and other prayer participants to hear. At first, Dicus asked the other officers why the inmates were in the gymnasium for prayer services. Then, Dicus began cursing and disparaging Muslims. Howard and several other inmates heard Dicus make statements about disliking Muslims, and that he killed Muslims overseas while he was in the military. Dicus stated that he hoped Muslims would die. Dicus' statements were heard by Howard and other individuals participating in the prayer service. Dicus intended for his statements to be heard by the Muslims praying.
- Howard heard Diggle warn Dicus that the Muslim inmates would file grievances regarding his statements. Dicus responded, "Mother fucker grievance. . . . . I kill[ ] Muslims, you know. . . . They need to get their ass up out of here. What the hell we allowing them to be down there doing whatever they doing?" Dicus also began yelling at the Muslim inmate on the prayer post. Dicus statements were heard by Howard and other individuals participating in the prayer service. Dicus intended his statements to be heard by the Muslim inmates.
- Dicus' outburst began very early on in the Eid prayer service and made the service unbearable to the participants. Because Dicus' comments were so disruptive, the Muslim inmates were not able to complete the Eid prayer service, and they did not have the Eid feast that they had planned to share in after prayer.
- Dicus told the Muslim inmates to gather their things and leave. As the Muslim inmates were preparing to leave, Howard began reciting a traditional Muslim call and response prayer to bring some closure to the disrupted Eid prayer service. Dicus then walked over to Howard, put him on the wall, and asked him if he was trying

> to incite a riot. Dicus then reiterated his command that the Muslim inmates had to leave the gymnasium.
>
> o Dicus' profane comments interrupted the Muslim inmates' religious gathering and served no legitimate penological purpose.

## V. CONCLUSIONS OF LAW

### A. Qualified Immunity

The Court will first address the issue of whether Defendants may assert the affirmative defense of qualified immunity at trial. Defendants did not file an Answer in this action, and the first time they asserted the defense was in their Proposed Jury Instructions. During closing arguments in this case, the Court ordered the parties to file briefings on this issue.

Qualified immunity is an immunity from suit rather than a defense to liability, and "ensures that officers are on notice their conduct is unlawful before being subjected to suit." Tarabochia v. Adkins, 766 F.3d 1115, 1121 (9th Cir. 2014). "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." White v. Pauly, 137 S. Ct. 548, 551 (2017) (citation and quotation marks omitted). Thus, in deciding whether officers are entitled to qualified immunity, courts consider whether (1) the facts show that the officer's conduct violated a constitutional right, and (2) if so, whether that right was clearly established at the time of the conduct. Tarabochia, 766 F.3d at 1121. Under the second prong, courts "consider whether a reasonable officer would have had fair notice that the action was unlawful." Id. at 1125 (quotation marks omitted). While a case directly on point is not required in order for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 131 S.Ct. 2074, 2083 (2011). The law allows the district court to "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." Mattos v. Agarano, 661 F.3d at 433, 440 (9th Cir. 2011).

The affirmative defense of qualified immunity should be pled by defendant in the Answer. Camarillo v. McCarthy, 998 F.2d 638, 639 (9th Cir. 1993) (citation omitted). However, the Ninth

Circuit has explicitly held that if the plaintiff fails to show prejudice, an affirmative defense may be raised for the first time during the summary judgment phase. Id. (citation omitted). The Court nonetheless is tasked to address the issue of qualified immunity "long before trial" and "at the earliest possible stage in litigation to preserve the doctrine's status as a true *immunity from suit* rather than a mere defense to liability." Morales v. Fry, 873 F.3d 817, 822 (9th Cir. 2017) (alteration in original) (citations and quotation marks omitted).

The Court finds that Defendants have waived the defense of qualified immunity in this case. The Defendants first raised this defense in its pretrial filings, and they have not offered a reasonable explanation as to this extreme delay. The Court thus finds that the Defendants have waived this defense.

Moreover, the Court finds that Plaintiff would be prejudiced if the Court were to permit the assertion of the defense at this time. Plaintiff could have pursued discovery, for example interrogatories, requests for admissions or document requests to establish certain facts as to the incidents to ensure that the alleged violative conduct fell squarely within established precedent. The Plaintiff was prevented from pursuing such discovery by the Defendants' late notice. As the Court finds that the Plaintiff would be prejudiced by allowing the Defendants to raise qualified immunity at this time. The Defendants may not raise it as a defense at trial.

For these reasons, the Court finds that Defendants may not assert the affirmative defense of qualified immunity, and proceeds to set forth its findings as to Plaintiff's claims.

### B. First Amendment Retaliation and Eighth Amendment Excessive Force Claims Against Sanchez

The First Amendment protects the right to seek redress of grievances from the government. U.S. Const., amend. I. Prisoners have a First Amendment right to file prison grievances and to pursue civil rights litigation in the courts. Rhodes v. Robinson, 408 F.3d 559, 567 (9th Cir. 2005). "Without those bedrock constitutional guarantees, inmates would be left with no viable mechanism to remedy prison injustices. And because purely retaliatory actions taken against a prisoner for having exercised those rights necessarily undermine those protections, such actions violate the Constitution quite apart from any underlying misconduct they are designed to shield." Id. To state

a viable First Amendment retaliation claim in the prison context, a plaintiff must allege: "(1) [a]n assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." Id. at 567-68. The Court may consider the timing of an allegedly retaliatory action as circumstantial evidence of retaliatory intent, particularly where a punishment comes soon after an inmate plaintiff airs a grievance. Bruce v. Ylst, 351 F.3d 1283, 1288 (9th Cir. 2003) (citing Pratt v. Rowland, 65 F.3d 802, 808 (9th Cir. 1995)).

The Eighth Amendment prohibits cruel and unusual punishment. U.S. Const., amend. VIII. When a prison official stands accused of using excessive physical force in violation of the cruel and unusual punishment clause of the Eighth Amendment, the question turns on whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically for the purpose of causing harm. Hudson v. McMillian, 503 U.S. 1, 6-7 (1992) (citing Whitley v. Albers, 475 U.S. 312, 320-21 (1986)). In determining whether the use of force was wanton and unnecessary, it may also be proper to consider factors such as the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response. Hudson, 503 U.S. at 7. Although an inmate need not have suffered serious injury to bring an excessive force claim against a prison official, the Eighth Amendment's prohibition on cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force.

With regard to Howard's First Amendment retaliation claim, the Court finds that, although Howard has a right to file grievances, Sanchez did not engage in any retaliatory action against Howard for filing a grievance. Howard sought to file a grievance regarding a cell search performed earlier on the day of November 12, 2011. Sanchez and Acala arrived with Stein at Howard's cell in order to obtain the grievance, as Howard characterized it as an emergency grievance. The Court finds that Sanchez restrained Howard as a result of Howard standing up quickly in his cell and saying that Sanchez was "going down." While the restraint perhaps amounted to an adverse action,

it was not performed for the purpose of chilling Howard's right to file grievances, and in fact served a legitimate penological purpose as Sanchez believed Howard made a threat.

Similarly, although Howard has a right to be protected from excessive force, the Court finds that the force Sanchez exerted while restraining Howard was not excessive. In light of the circumstances at the moment, Sanchez applied the minimum amount of force to ensure his safety, the safety of his colleagues, and Howard's safety. Additionally, the force that Howard was exposed to was appropriate in the context of the broader circumstances; as a prison inmate, Howard is not entitled to be free of such *de minimis* force at all times. The Court also finds that there is no evidence in the record that Howard sustained any injuries as a result of the restraint.

Therefore, the Court finds in favor of Sanchez as to the First Amendment retaliation and Eighth Amendment excessive force claims.

### C. First Amendment Retaliation Claim Against Bloomfield

The Court incorporates the standard for First Amendment retaliation as set forth above. Although Howard had the right to file grievances and even a civil suit against Bloomfield and other COs, the Court does not find that Bloomfield was aware of the earlier-filed lawsuit that named Bloomfield as a Defendant at the time Bloomfield confiscated the hot pot and fan from Howard's cell. Even though the confiscation amounted to an adverse action, the Court finds that Bloomfield had no retaliatory motivation to confiscate those items and file a notice of charges regarding the confiscation. The Court further finds that the confiscation, and subsequent filing of the notice of charges and disciplinary hearing, furthered a legitimate penological goal to prevent inmates from having altered and unsafe items in their cells.

For these reasons, the Court finds in favor of Bloomfield as to the First Amendment retaliation claim.

### D. First Amendment Free Exercise Claim Against Dicus

The First Amendment to the United States Constitution provides that Congress shall make no law respecting the establishment of religion, or prohibiting the free exercise thereof. U.S. Const., amend. I. The United States Supreme Court has held that prisoners retain their First Amendment rights, including the right to free exercise of religion. O'Lone v. Estate of Shabazz,

482 U.S. 342, 348 (1987). The Court has also recognized that limitations on a prisoner's free exercise rights arise from both the fact of incarceration and from valid penological objectives. Id.; McElyea v. Babbit, 833 F.2d 196, 197 (9th Cir. 1987). However, a plaintiff may prevail on a free exercise claim under the First Amendment if a prison officer engages in action that imposes a "substantial burden" on plaintiff's exercise of religion. Canell v. Lightner, 143 F.3d 1210, 1215 (9th Cir. 1998). "Relatively short-term and sporadic" interferences typically do not amount to a substantial burden. Id. A substantial burden on the free exercise of religion exists where a government action "tends to coerce [an] individual to forego her sincerely held religious beliefs or engage in conduct that violates those beliefs." Jones v. Williams, 791 F.3d 1023, 1033 (9th Cir. 2015).

The Court finds that, even if Defendants had not waived the defense of qualified immunity, Dicus would not be entitled to the defense on the claim. As set forth in Jones, forcing an individual to forego her sincerely held beliefs is a clearly established substantial burden. The comments Dicus yelled during the August 19, 2012 Eid prayer about hating Muslims and killing them overseas, laced with profanities, made it impossible for the Muslim participants to continue their prayer. When they stopped to ask Dicus questions, he continued to make profane statements, and eventually dismissed them from the gymnasium before they could complete the prayer. Howard and his fellow participants thus were unable to fulfill the Eid prayer requirements in accordance with their sincerely held beliefs. The Court finds that this was Dicus' intent. When Howard made an attempt to complete the prayer in a call and response fashion, he was further discouraged by Dicus asking him if he was trying to incite a riot, an offense which merited a notice of charges in the prison. While Howard did not receive a notice of charges, he and the other prayer participants nonetheless were forced to leave the gymnasium – which served as the makeshift chapel that day – before completing their prayers. The Court finds that Dicus' actions did not serve a legitimate penological purpose, as neither Howard nor the other participants engaged in any misbehavior that merited interference from the COs present. The Court also finds that the comments Dicus made were intentionally so disruptive, offensive and threatening that they caused the prayer participants to end their prayer service. The termination of the service was further expedited by Dicus ordering

the inmates back to their cells. He did all of this despite being warned by other officers that his conduct was inappropriate and inconsistent with prison policy. Therefore, Dicus is liable for violating Howard's right to the free exercise of religion under the First Amendment.

Both compensatory and punitive damages are available under 42 U.S.C. § 1983. Smith v. Wade, 461 U.S. 30, 56 (1983). Punitive damages may be assessed under § 1983 when a defendant's conduct is shown to be motivated by evil motive or intent, or if it involves reckless or callous indifference to the federally protected rights of others. Id. The Court finds that Howard is entitled to compensatory damages arising from Dicus' interference with the Eid prayer service. The Court also finds that Dicus' statements during the service were of such an egregious nature that Howard is entitled to punitive damages. Statements in reference to killing Muslims made while Muslim inmates were attempting to observe a religious holiday are reckless or callously indifference, at minimum. The Court sets forth the damages amounts below.

**VI.   JUDGMENT**

**A. Damages**

The Court finds that Dicus is liable to Howard to damages arising from violations of the First Amendment right to free exercise of religion. The Court awards $15,000 in compensatory damages, and $10,000 in punitive damages.

**B. Attorney's Fees and Costs**

The Court awards attorney's fees and costs to Plaintiff, pursuant to 42 U.S.C. § 1988 which permits the award of a "reasonable" attorney's fee. Fox v. Vice, 563 U.S. 826, 832-33 (2011). Plaintiff shall submit a proposed order with underlying documentation as to fees and costs within 30 days of this order.

Accordingly,

**IT IS ORDERED** that the Court finds for Defendant Sanchez on Count I (First Amendment retaliation and Eighth Amendment excessive force).

**IT IS FURTHER ORDERED** that the Court finds for Defendant Bloomfield on Count V (First Amendment retaliation).

**IT IS FURTHER ORDERED** that the Court finds for the Plaintiff against Defendant Dicus on Count VI (First Amendment free exercise) and awards damages as noted in this Order.

The Clerk of Court shall enter judgment accordingly and close this case.

DATED: September 6, 2018.

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**